STEPTOE & JOHNSON LLP
STEPHANIE A. SHERIDAN, State Bar No. 135910
ssheridan@steptoe.com
ANTHONY J. ANSCOMBE, State Bar No. 135883
aanscombe@steptoe.com
MEEGAN B. BROOKS, State Bar No. 298570
mbrooks@steptoe.com
Steuart Tower, 1 Market St #1800
San Francisco, CA 94105
Telephone: (415) 365-6700
Facsimile: (415) 365-6678

Attorneys for Defendant
STEIN MART, INC.

# UNITED STATE DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARILYN SPERLING, an individual; individually and on behalf of all others similarly situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>STEIN MART, INC.,<br><br>DEFENDANT. | Case No. 5:15-cv-01411-AB-KK<br><br>**DECLARATION OF MICHELLE BERRIGAN DREICER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. André Birotte, Jr.<br>Date: Friday, February 16, 2018<br>Time: 10:00 a.m.<br>Courtroom: 7B – First Street |

## DECLARATION OF MICHELLE BERRIGAN DREICER

I, Michelle Berrigan Dreicer, declare as follows:

1. I am employed by Stein Mart, Inc. as a Retail Buyer. I have been in this position since February 16, 2004. As a Buyer, I am responsible for planning, selecting and purchasing quantities of goods and merchandise that are sold in retail stores and at Steinmart.com. I have responsibility for several product areas, which include luggage, men's tailored suits, Alan Flusser suits, electronics and gifts. I source new and review existing goods to ensure Stein Mart's products remain competitive. In my position, I have access information regarding the overall direction, control and coordination of Stein Mart's activities. I also have access to its policies, including its Fair Pricing Policy, and to its sales and merchandise records. I am submitting this declaration in order to provide information regarding Stein Mart's Fair Pricing Policy, and sales made in Stein Mart's California stores. If called upon as a witness, I could and would competently testify to the matters stated herein.

2. To the extent this declaration is based upon my review of Stein Mart's business records, those records are kept in the regular course of business, entries are made on those records in a timely manner by people with knowledge of the information being entered, and it is the regular practice of Stein Mart's business to maintain such records.

3. I have previously given a deposition in this case. For the Court's convenience, I will explain here how we price our inventory, how we derive *Compare At prices, and how we know that these *Compare At prices reflect real prices charged by other retailers.

4. Stein Mart positions itself as a retailer of high quality fashion, accessories, household goods and electronics, which we offer at everyday prices that are lower than the prices which our competitors charge for the same or similar goods. Our offerings include many well-known national brands, such as Kenneth

Cole, Lauren, Tommy Hilfiger and Nautica, as well as our own private label brands, such as Alan Flusser and Peck & Peck.

5. From my many years at Stein Mart, I know that Stein Mart strives to maintain low overhead, such as by siting our retail stores in less expensive areas than many of our competitors do. We tend to have fewer service personnel in store than do many of our competitors. And, because we are a large national retailer, we are able to buy goods in quantities that permit our vendors to give us favorable prices. Stein Mart passes these savings on to its customers in the form of every day prices that are usually appreciably lower than what our competitors charge. Typically, we offer everyday pricing that can be as much as 60% below what department stores, boutiques, specialty stores and other full price retailers charge. For the Court's reference, we view our competitors as including major department stores such as Macy's, Lord & Taylor, Nordstrom, Belk, Dillard's, Kohl's, and in select product areas, boutique or specialty stores such as Chico's and Men's Warehouse.

6. Buyers at Stein Mart have primary responsibility for determining the selection and pricing of the merchandise we sell. Here it is important to note that the retail business is cyclical and seasonal. Especially for clothing and home good retailers such as Stein Mart, we need to ensure that our inventory matches what our customers need at any given time of the year. We need to have Christmas items to sell at Christmas, winter coats to sell in the winter, and shorts and tee shirts to sell in the spring and summer. At Stein Mart, and in the retail industry generally, we accomplish this by planning our product offerings well in advance of when merchandise hits the retail floor. We cannot wait until summer to start thinking about where we will get swimwear to sell. At Stein Mart, we typically start shopping for next year's season as the current season comes to a close. This allows us to use our recent experience to inform what we should offer during the next year's season. We use our knowledge of what has been successful for us, and what our competitors have done, to inform what we should offer for the following year.

7. I will now address the process by which Stein Mart buyers set merchandise prices. As might be expected for any retailer, Stein Mart sets financial goals for the income it wants to derive from particular segments of its business. Buyers are given targets for margin for their merchandise categories, and we have discretion as to how we will price our items to achieve those goals. Buyers make individualized pricing decisions, which include factors such as cost, seasonality of product, and competitive conditions. As a general matter, however, we target our mark-up to be less than what our full price competitors charge.

8. I am aware that Plaintiffs here allege that the prices designated as "*Compare At" prices are not actual prices charged by other retailers. These allegations are false. Our *Compare At prices do, in fact, reflect what other retailers charge for the same or similar merchandise. As I testified at my deposition, Stein Mart bases its *Compare At prices on suggested retail prices (MSRPs) which we receive from our vendors. We receive this information at the time we make our purchase orders, and even though this occurs well in advance of when goods reach the retail floor, we have several reasons to have a high degree of confidence that these MSRPs are real prices that other retailers will charge.

9. First, our suppliers are well positioned to know what other retailers will charge for their goods, as they monitor the prices those prices through purchase orders and ticket production on goods. Our relationships with our suppliers are also developed over time, and we have many opportunities to verify that what they have told us is accurate. Year to year, we know what other retailers have charged for the merchandise, and we would know if a supplier was giving us MSRPs that did not conform to what other retailers actually charge in the market.

10. Second, and relatedly, I and other Stein Mart buyers, assistant buyers, and everyone in merchandising, make it our business to understand the competitive market for the good we sell. All of us devote a significant amount of our professional time to a process we call "competitive shopping" or "competitor

1   shopping." I, for example, spend about 25% of my time on market research.
2   Specifically, I spend a considerable amount of time on-line, reviewing what our
3   competitors are selling and what they are charging. I go to New York for about a
4   week a month, and while there, I visit the retail floors of competitors, again to see
5   what they are selling and what they are charging. I also check out retail offerings
6   locally in the Jacksonville area, and when I travel to other parts of the country.
7   Other buyers, and their support teams, do the same thing. Through this process we
8   develop substantial knowledge and expertise about the competitive markets for our
9   merchandise. We know for a fact that other major retailers do, in fact, charge
10  MSRP for the same or similar goods to what we sell. This confirms our
11  knowledge that the *Compare At prices shown on our price tags are real prices,
12  charged by other major retailers. Our market expertise further informs how we
13  price our merchandise. Deep knowledge about our competitors allows us to select
14  prices that will offer every day savings off of what our competitors charge, even as
15  they mark their prices down.

16        11.   One issue that has arisen in this case is how Stein Mart can provide
17  accurate *Compare At prices for goods that are sold under a Stein Mart brand
18  name. The answer to this is easy. The suppliers who furnish our store brand items
19  also make the same, or virtually identical, merchandise for other retailers. For
20  example, the Alan Flusser suit line that I manage is equivalent to the merchandise
21  offered under the Paisley & Gray label sold at other national retailers. I know from
22  my own personal knowledge that the *Compare At prices we show for these clothes are
23  actual prices charged, for example, by other retailers such as Men's Warehouse.

24        12.   Another question that has arisen is under what circumstances Stein
25  Mart bases its *Compare At prices on the prices of similar merchandise, as
26  opposed to the exact same merchandise. Here, it is useful to understand that how
27  we define "similar." In our business, we define as "similar" products that are the
28  same as other products in quality, design, look and feel, but which might have

some modest cosmetic difference.  For example, we would define a black suitcase and white suitcase as "similar," notwithstanding that they are of exactly the same design, stitch, fabric type, and quality. When we base our *Compare At prices on "similar" items, it is because we know that our suppliers will be selling such highly similar items to other retailers, and that those retailers will be charging MSRP.  But at the time we make our purchase decisions, we do not know what fabric styles, prints or other small details other retailers will select.  We do not, however, believe that our customers will see such tiny difference as relevant to the *Compare At price we identify.

13. As a final matter, I will speak to the purchases of the named Plaintiffs in this case.  With regard to Ms. Sperling, she has alleged the purchase of an item she identifies as a "Revelation Travel Bag."  I was the Buyer with responsibility over the business Stein Mart did with a brand called Revelation, which manufactured luggage goods.  Stein Mart ordered about ten styles of bags from Revelation before Revelation ceased doing business in the U.S in about 2014.  I am very familiar with the line of Revelation items and the prices of Revelation merchandise.

14. I understand that Plaintiff Marilyn Sperling has alleged in this case that she purchased a Revelation bag at Stein Mart's La Quinta, California store "on or about November 2014" for $59.99.

15. Stein Mart's records reflect that it has not sold any Revelation bag with a list price of $59.99, in any store, from 2014 to the present.  Nor has Stein Mart sold any Revelation bags with a final price (after discounts and tax) of $59.99 from 2014 to the present.

16. Stein Mart is unable to locate Plaintiff's purchase by searching for her name, because Stein Mart does not have the capability to search for a past purchase using a customer's name alone, except in certain instances where the customer has a company credit card and uses it to make a purchase at a Stein Mart, or if the customer is a preferred customer and uses her preferred customer account to make a purchase. Based on a review of company records, neither of these circumstances

applies to Ms. Sperling.  Thus, the company has no way to trace if Ms. Sperling ever purchased a Revelation bag from us at any time, and our current records reflect no evidence of her purchase of any Revelation product from us ever.

17. Despite our uncertainty as to exactly what product Ms. Sperling purchased, I can attest from personal knowledge that the *Compare At prices shown for this line of products were true prices for the same or similar goods.  For this line of merchandise, Stein Mart routinely receives "line sheets" from the vendor that provide the MSRP/"*Compare At" price for all items purchased from that vendor.

18. With regard to Mr. Schuh's purchases, I can similarly attest from personal knowledge that the *Compare At prices for his purchases were true prices for the same or similar goods sold by other retailers.

19. First, with regard to the Kenneth Cole pants and jacket purchased by Mr. Schuh, I was personally responsible for buying these items, and can confirm that the vendor, Lanier, provided Stein Mart with line sheets that confirm the MSRP/"*Compare At" prices that ultimately appeared on the Stein Mart tags for those items.  Moreover, I have personal knowledge that other retailers – one example being Belk -  sell Kenneth Cole brand suit separates that are almost identical to the pants and jacket purchased by Mr. Schuh at the "*Compare At" prices.

20. With regard to the Alan Flusser shirt purchased by Mr. Schuh, I likewise have personal knowledge that the same or virtually identical shirt as that purchased by Mr. Schuh was sold by other retailers at Stein Mart's "*Compare At" price.  While I am not directly responsible for buying Stein Mart's private label Alan Flusser shirts, I have personal knowledge that the vendor that manufactures Alan Flusser brand shirts for Stein Mart also sells virtually identical shirts to other retailers, who then sell those shirts under their own private labels.  As one example, I know that an online retailer known as Tip Top Tailors purchases shirts from this vendor that are either identical or virtually identical to the shirt purchased

by Mr. Schuh, and sells them under the Daniel Hechter Paris and Jones New York labels at or above the Stein Mart "*Compare At" price.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this ___5th___ of January, 2018 at Jacksonville, Florida.

By: /s/ Michelle Berrigan Dreicer
Michelle Berrigan Dreicer

85680495v1      1.      Case No.: 5:15-cv-01411-AB-KK
DECLARATION OF MICHELLE BERRIGAN DREICER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT